**Slip. Op. 99 – 18**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, JUDGE**

---

OLYMPIA INDUSTRIAL, INC.,

        Plaintiff,

        v.

THE UNITED STATES,

        Defendant,

        and

WOODINGS-VERONA TOOL WORKS, INC.,

        Defendant-Intervenor.

Consolidated
Court No. 95-10-01339

---

[Second Remand Determination in the second administrative review of the antidumping duty order of the U.S. Department of Commerce is sustained.]

Dated: February 17, 1999

Powell, Goldstein, Frazer & Murphy LLP (Lawrence R. Walders), for plaintiff Olympia Industrial, Inc.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Henry R. Felix); Office of the Chief Counsel for Import Administration, United States Department of Commerce (Melanie A. Frank), of counsel, for defendant.

Wiley, Rein & Fielding (Charles Owen Verrill, Jr., Alan H. Price, Willis S. Martyn III), for defendant-intervenor Woodings-Verona Tool Works, Inc.

## OPINION

**GOLDBERG, Judge:** In this action, the Court reviews the Department of Commerce's ("Commerce") Second Remand Determination, dated August 31, 1998, of the Notice of Final Results of Administrative Review: Heavy Forged Hand Tools, Finished or Unfinished, With or Without Handles, from the People's Republic of China, 60 Fed. Reg. 49,251 (Sept. 22, 1995) (hereinafter "Remand Results").[1] Plaintiff, Olympia Industrial Inc. ("Olympia"), a respondent in the underlying administrative review, contests the Remand Results as unsupported by substantial evidence.

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  The Court sustains the Remand Results.

---

[1]  Pursuant to the new antidumping and countervailing duty regulations, all remand determinations dated after May 16, 1997, are available on the International Trade Administration's website.  See Antidumping Duties and Countervailing Duties, 62 Fed. Reg. 27296, 27330 (Dep't of Commerce 1997) (rules and regulations).  The remand results from this case can be found at http://www.ita.doc.gov/import_admin/records/remands/98-49.htm.

## I.

## BACKGROUND

Olympia, a U.S. importer of heavy forged hand tools ("HFHTs") from the People's Republic of China ("PRC"), and defendant-intervenor, Woodings-Verona Tool Works, Inc. ("Woodings"), a U.S. producer of HFHTs and petitioner in the underlying agency action, commenced this consolidated case under 19 U.S.C. § 1516a and 28 U.S.C. § 2631(c) (1994) seeking judicial review of certain portions of the final results of Commerce's second administrative review.  In particular, both parties contested the dumping margins in the Final Results, focusing on certain values employed by Commerce when it calculated the foreign market value ("FMV") of the HFHTs imports using a factors of production ("FOP") analysis.[2]  Initially, the Court rejected certain challenges, yet remanded two issues: (1) the Court ordered Commerce to reconsider whether surrogate country data or PRC import data should be used to value the steel inputs for the

---

[2]  If Commerce cannot determine a FMV for a nonmarket economy ("NME") respondent under the general provisions of 19 U.S.C. § 1677b(a), Commerce must instead use the FOP methodology to estimate FMV for the merchandise in question.  See 19 U.S.C. § 1677b(c)(1).  In the administrative review on appeal, Commerce resorted to a FOP analysis.  See Final Results, 60 Fed. Reg. at 49,251-52.

HFHTs; and (2) the Court ordered Commerce to reconsider its methodology for calculating foreign inland freight expenses. See Olympia Indus., Inc. v. United States, 21 CIT __, Slip Op. 97-44 (Apr. 10, 1997) ("Olympia I").

In considering Commerce's first remand determination, the Court sustained Commerce's methodology for calculating inland freight expenses. See Olympia Indus., Inc. v. United States, 22 CIT __, __, 7 F. Supp.2d 997, 1002 (1998) ("Olympia II"). The Court, however, found that Commerce again failed to seek additional information from the parties as to the reliability of the PRC steel import data. Instead, Commerce rejected the data in its entirety without review. In doing so, Commerce stated that its policy was to evaluate inputs sourced from market-economy suppliers only when those inputs are actually purchased by the NME manufacturer. See Department of Commerce's Results of First Remand Determination (July 21, 1997) ("First Remand Determination"), at 8-9. Because the import data at issue related to inputs purchased by NME trading companies, not by NME manufacturers, Commerce declined to solicit new information or to use the existing PRC import data. Commerce then concluded that "because there are no actual market-based prices for steel

purchases by the manufacturer, we continue to use surrogate country data to value the steel input used in the production of HFHTs."  First Remand Determination, at 9-10.

The Court rejected this treatment.  See Olympia II, 22 CIT at __, 997 F. Supp.2d at 1000-02.  As a result, the Court again remanded so that Commerce might consider whether the PRC trading companies' steel input data is the best information available to value certain FOPs.  Specifically, the Court instructed Commerce to reopen the administrative record to investigate the reliability of the PRC import data submitted by the trading company.  The Court now reviews Commerce's compliance with these instructions in its Remand Results.

## II.
### STANDARD OF REVIEW

Commerce's remand determination will be sustained if it is supported by substantial evidence on the record and is otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B) (1994).

### III.

### DISCUSSION

In accordance with the Court's instructions in <u>Olympia II</u>, Commerce reopened the record on remand to ascertain the reliability of the PRC trading company data.  Specifically, Commerce requested information on (1) the volume and value of trading company imports, (2) the type and quality of the steel imported by the trading company, and (3) the level of steel purchased from the trading company by the NME producers.  <u>See</u> Remand Results, at 7-8.  Using this data, Commerce found that the steel imported by the trading company "is of the same grade and has the same range of diameters as steel that the NME manufacturers used to produce the subject merchandise."  <u>Id.</u> at 8.  Yet, after examining the pricing data, Commerce found that the prices paid by the trading company were aberrationally low, even though purchased from a market-economy source and paid for in convertible currencies.  <u>Id.</u>  Commerce therefore determined that the PRC trading company pricing data was unreliable and, hence, unacceptable for purposes of valuing the steel inputs used to produce the HFHTs; instead, Commerce continued to use the Indian surrogate country data to value the inputs in its FOP analysis.

Olympia challenges this decision as unsupported by substantial evidence.  Olympia asserts that Commerce only concluded that the trading company prices were aberrationally low by comparing the trading company data to average U.S. and Indonesian pricing data.  Olympia maintains this simple comparison in and of itself proves nothing, much less which data amounts to the best available information to value the steel used to produce the Chinese hand tools.  More specifically, Olympia contends Commerce acknowledged that the PRC trading company data reflects pricing for steel actually used by the NME producers, whereas the same cannot be said for the steel imported into the United States and Indonesia.  Indeed, Olympia points out that the U.S. and Indonesian data reflect pricing for general basket categories of steel bars, not the specific type used by the NME producers and imported by the trading company.  Moreover, Olympia argues that comparison to the U.S. and Indonesian data is fundamentally flawed because the basket categories include forged steel bars, and the PRC trading company only imported unforged steel bars (and, forged bars are more expensive than unforged bars, thereby skewing the U.S. and Indonesian average upwards).

Thus, Olympia maintains Commerce's remand determination is unsupported by substantial evidence.

The Court does not agree.  It is true the record shows that the PRC producers subjected the steel bars to the forging process; the record, however, does not show that the PRC trading company imported unforged steel bars.  See Remand Results, at 12. Commerce also found discrepancies regarding the amount of steel purchased from the trading company and the amount ultimately used by the NME manufacturers.  Id. at 9.  The Court has examined this confidential record evidence and finds that Commerce properly exercised its discretion when it used the U.S. and Indonesian data as a benchmark to determine whether the trading company data was aberrational.  The Court holds that the record supports Commerce's conclusion that the PRC trading company data was aberrational and unreliable.  It was therefore appropriate for Commerce to use the Indian surrogate data to value the steel inputs, and the Court finds this decision supported by substantial evidence.

The Court notes in closing that in its Remand Results, Commerce again made the argument that its first remand determination was correct and that under the statutory framework

it is not required to investigate whether NME trading company data should be used to value inputs for subject merchandise in a FOP analysis.  For the reasons discussed in <u>Olympia II</u>, Commerce again is wrong; when Commerce is presented with NME trading company data, it must seek information to assess the reliability of the data and then ascertain whether it constitutes the best available information for purposes of the FOP analysis.  It is not enough to reject the information out of hand.  Commerce's simple intransigence on this point does not merit further response.

## IV.
### <u>CONCLUSION</u>

For the forgoing reasons, the Court sustains Commerce's Remand Results as supported by substantial evidence.  A separate order will be entered accordingly.

_____
Richard W. Goldberg
JUDGE

Dated:     February 17, 1999
           New York, New York.